Marciano **RODRIGUEZ**, et al., Plaintiffs,

v.

**UNITED STATES of America,
et al., Defendants.**

97–1182–Civ.

United States District Court,
S.D. Florida.

Sept. 17, 1997.

Randall Challen Berg, Jr., JoNel Newman, Peter M. Siegel, Florida Justice Institute Incorporated, Miami, FL, Michael A. Gross, for Emelina Rodriguez.

Randall Challen Berg, Jr., JoNel Newman, Peter M. Siegel, Florida Justice Institute Incorporated, Miami, FL, for Marciano Rodriquez, Rafael Caramazana, Gina Martelly, Antonia Fernandez, Eduardo Marsans.

Ellen Marjorie Saideman, Fort Lauderdale, FL, for Henriette Guillaume.

Karon Margaret Coleman, Dade County Atty.'s Office, Miami, FL, for Metropolitan Dade County.

Mark Robert Schlakman, W. Dexter Douglass, State of Florida Office of the Governor, Tallahassee, FL, for Lawton M. Chiles, Jr.

Parker D. Thomson, Thomson, Muraro, Razook & Hart, P.A., Miami, FL, Michael A. Gross, Ana Cristina Martinez, Office of the Atty. General, Tallahassee, FL, for State of Florida, Attorney General.

Richard E. Doran, General Counsel, Tallahassee, FL, for Edward A. Feaver.

Jerome Wayne Hoffman, Tallahassee, FL, Michael A. Gross, for Douglas M. Cook.

Edward George Labrador, John Jefferson Copelan, Jr., Broward County Atty.'s Office, Fort Lauderdale, FL, for Broward County.

### ORDER

GRAHAM, District Judge.

**THIS CAUSE** came before the Court upon the following:

1. Defendants' Motion to Dismiss (DE 30); and

2. Plaintiffs' Motion for Preliminary Injunction (DE 28).

## I. STATEMENT OF FACTS

### A. PARTIES

Plaintiffs Marciano Rodriguez, Emelia Rodriguez, Rafael Caramazana, Gina Martelly, Antonia Fernandez, Eduardo Marsans, and Henriette Guillaume are poor individuals who are blind, elderly or disabled legal non-citizens receiving SSI and Food Stamp benefits from the United States government.

These plaintiffs brought this lawsuit as a class action pursuant to Fed.R.Civ.P. 23 on behalf of all poor individuals who are blind, elderly or disabled legal non-citizens residing in Florida who were formerly eligible for, or who will be eligible for in the future federal SSI and related Food Stamp benefits, and who, based solely on their non-citizen status, will lose or be denied those benefits as a result of § 402 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. No. 104–193, 110 Stat. 2105, *codified at,* 8 U.S.C. §§ 1601, *et. seq.* (hereinafter referred to as the "Welfare Reform Act"). The parties stipulated that there was a proper class and that the case could proceed as a class action. This Court approved the class stipulation on May 15, 1997. When this action was originally filed, the class was estimated to involve approximately 80,000 individuals throughout Florida. The individual plaintiffs named above and the class of individuals they represent shall sometimes hereinafter collectively be referred to as "The Plaintiff Class".

Also participating as plaintiffs in this action are the following: *(1)* The State of Flori-

da; *(2)* Metropolitan Dade County, Florida ("Dade County"); *(3)* Florida Governor Lawton M. Chiles, Jr., ("Governor"); *(4)* Florida Attorney General Robert A. Butterworth ("Attorney General"); *(5)* Secretary of Florida Department of Children and Family Services, Edward A Feaver ("Secretary of Family Services"); and *(6)* Director of the Florida Agency for Health Care Administration, Douglas M. Cook ("Director of Health Care"). The State of Florida, Governor, Attorney General, Secretary of Family Services, and Director of Health Care are sometimes hereinafter collectively referred to as the "Florida State Plaintiffs".

Plaintiffs have brought this action against the following defendants: *(1)* The United States of America ("USA"); *(2)* Secretary of Health and Human Services ("HHS"), Donna Shalala ("Secretary of HHS"); *(3)* Acting Commissioner of the Social Security Administration ("SSA"), John J. Callahan ("Commissioner of SSA"); and *(4)* Secretary of Agriculture, Daniel Glickman ("Secretary of Agriculture"). The Secretary of HHS, Commissioner of SSA and Secretary of Agriculture have been sued in their official capacities only.

The counts of the complaint in this action are as follows: *(1)* The Plaintiff Class v. All defendants: Violations of Equal Protection Rights Under the Fifth Amendment of the United States Constitution; *(2)* Florida State Plaintiffs and Dade County v. All Defendants: Violations of the Administrative Procedure Act (Abuse of Discretion); *(3)* Florida State Plaintiffs and Dade County v. All Defendants: Violations of the Administrative Procedure Act (Rulemaking Procedures); *(4)* Florida State Plaintiffs and Dade County v.

All Defendants: Breach of Contract; and *(5)* Florida State Plaintiffs and Dade County v. All Defendants: Violations of Article IV, § 4, and the Tenth Amendment of the United States Constitution.

## B. BACKGROUND

Pursuant to 42 U.S.C. §§ 1381, *et seq.,* the federal government provides subsistence level benefits known as Supplemental Security Income ("SSI") to individuals who are impoverished and either elderly, blind or disabled. In order to qualify, individuals must show: (1) that they have minimal assets and income [1] and (2) they are blind [2], severely disabled [3] or elderly [4].

Pursuant to 7 U.S.C. §§ 2011, *et seq.,* the federal government provides benefits known as food stamps to financially needy individuals and families. In order to qualify, individuals must show that they have minimal assets and income.[5] Anyone who qualifies for SSI benefits automatically qualifies for food stamp benefits. 7 U.S.C. § 2014(a).

Through these programs, SSI and food stamp benefits have been heretofore available to qualified legal aliens.

Over the years, the costs of these programs increased dramatically. Due to these increased costs, Congress investigated possible changes through which it could reform the welfare system. During its investigation, Congress discovered that the number of alien welfare recipients were increasing at a rapid rate. For example, 151,207 aliens received SSI benefits in 1983 as compared to 683,178 in 1993. UNITED STATES GENERAL ACCOUNTING OFFICE, *Report to the Ranking Minority Member, Subcommittee on Human Resources, Committee on Ways and Means,*

---

**1.** See 42 U.S.C. §§ 1382—1382b for general financial eligibility rules. For example, an individual who receives SSI benefits cannot have resources that exceed $2,000. A married couple cannot have combined resources exceeding $3,000. 42 U.S.C. § 1382(a).

**2.** Pursuant to this statute, an individual is blind if "he has central visual acuity of 20/200 or less in the better eye with the use of a correcting lens." 42 U.S.C. § 1382c(a)(2).

**3.** Pursuant to this statute, an individual is disabled if "he is unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3).

**4.** Elderly individuals must be 65 years of age or older. 42 U.S.C. § 1382c(a)(1)(A).

**5.** 7 U.S.C. § 2014. For example, a household that receives food stamps cannot have resources that exceed $2,000. If that household includes a member who is 60 years of age or older the household cannot have resources that exceed $3,000. 7 U.S.C. § 2014(g).

*House of Representatives: Welfare Reform: Implications of Proposals on Legal Immigrants' Benefits,* GAO–HEHS–95–58 at p. 7 (February 1995) (hereinafter referred to as the *"February 1995 GAO Report"*). In addition, aliens constituted approximately 6% of all SSI cases in 1986, but comprised 12% of all SSI cases by 1994. UNITED STATES GENERAL ACCOUNTING OFFICE, *Testimony Before the Subcommittee on Human Resources, Committee on Ways and Means, House of Representatives: Supplemental Security Income: Noncitizen Caseload Continues to Grow,* GAO–T–HEHS–96–149 at p. 4 (May 23, 1996) (Statement of Jane L. Ross, Director Income Security Issues: Health, Education, and Human Services Division) (hereinafter referred to as the *"May 1996 GAO Report"*). In terms of cost, the General Accounting Office determined that aliens received approximately $3.6 billion in benefits during 1996. *May 1996 GAO Report* at p. 4. Furthermore, the number of aliens receiving SSI benefits increased by 6.4% from 1994 to 1995, even though the total number of SSI cases only increased 3.5% during that same period of time. *Id.*

To reduce the increasing costs of the welfare programs, to promote self sufficiency amongst aliens, and to encourage aliens to naturalize, Congress enacted the Welfare Reform Act. On August 22, 1996, this Act became law.

The Welfare Reform Act, 8 U.S.C. § 1612, changed welfare eligibility rules for legal aliens. Under the new rules, many legal aliens no longer qualify for SSI or food stamp benefits. *See* 8 U.S.C. § 1612. The groups of legal aliens who are still eligible for Social Security and Food Stamp benefits include the following groups: (1) refugees; (2) asylees; (3) certain aliens who have had their deportation withheld; (4) aliens who were granted status as Cuban or Haitian entrants; (5) certain Ameriasians; (6) lawful permanent residents who have worked 40 qualifying quarters; (7) legal aliens who were honorably discharged or are on active duty in the Armed Forces. 8 U.S.C. § 1612(a)(2). In addition, through recent amendments to the Welfare Reform Act, Congress provided that groups of legal aliens that are still eligible for Social Security benefits only, include the following: (1) legal aliens who were lawfully residing in the United States and who were receiving SSI benefits on August 22, 1996; (2) an alien who was lawfully residing in the United States on August 22, 1996 and is blind or disabled; (3) certain American Indians; and (4) Certain SSI beneficiaries who are receiving benefits pursuant to applications that were filed before January 1, 1979. 8 U.S.C. § 1612(a)(2)(E—G).

Through the Welfare Reform Act, Congress also provided that all legal aliens were to be evaluated under the new guidelines by the Social Security Commissioner. 8 U.S.C. § 1612(a)(2)(D). Legal aliens who were not receiving benefits as of August 22, 1996, were not entitled to any such benefits unless they met the new eligibility requirements. Legal aliens who were already receiving benefits as of August 22, 1996, had to requalify under the new eligibility rules. If they could not, their SSI benefits would be terminated effective September 30, 1998 and their food stamp benefits would be terminated effective August 22, 1997. 8 U.S.C. § 1612(a)(2)(D), *as amended by,* Pub.L. 105–33 § 5301. However, some of these aliens will continue to receive replacement food stamp benefits through aid that they receive from the State of Florida until June 30, 1998.

The Social Security Commissioner issued a policy for interpreting the Welfare Reform Act. This policy was issued pursuant to the SSA's Program Operations Manual System. The Policy is entitled Special Processing Requirements That Apply To Current Recipients, SI 00502.150 SSI Eligibility for Aliens Receiving Benefits on 8/22/96 (1996 Legislation). The Policy shall hereinafter be referred to as the "POMS Policy." A Copy of the POMs Policy is attached as Exhibit C to Defendants' Memorandum in Support of Their Motion to Dismiss Plaintiffs' Claims (DE 33). The POMS Policy eliminated all benefits to individuals who had pending SSI and Food Stamp applications as of August 22, 1996. Thus, legal aliens who applied for SSI and Food Stamp benefits before August 22, 1996, but did not obtain any award or approval for those benefits prior to that date[6] have been denied all such benefits,

---

6. The parties have informed the Court that the POMS Policy may be altered due to recent

including those benefits extending back to the date of their applications.

Pursuant to 42 U.S.C. § 1383(g), the State of Florida (including Dade County) entered into an agreement with the SSA to provide interim assistance to prospective welfare recipients while they were waiting for their applications to be processed. This interim assistance was necessary because it often took up to two years before an applicant would receive a favorable determination.

Dade County estimates that it advanced approximately $800,000 in interim assistance prior to August 22, 1996. Due to the SSA's POMS Policy, Dade County has not been reimbursed for the interim assistance it advanced.

As a result of the Welfare Reform Act, the Plaintiff class will lack subsistence level benefits that assist them in meeting their most basic needs. This will cause severe hardship on the Plaintiff Class, including homelessness, lack of food, and possible death.

In addition, the impact on the State of Florida and Dade County will be substantial because a high concentration of Plaintiff Class members reside in Florida and Dade County.[7] The State of Florida has already responded in part to the crisis by enacting the Temporary Income Bridge Program which makes $12,000,000 available for replacing food stamp benefits to certain members of the plaintiff class who are 65 years of age or older.[8] *See* Temporary Income Bridge Program, H.B. 1835, Ch. 97–259, Laws of Florida § 10 and Budget Amendment, EOG–0265 (Approved 9/2) (hereinafter "The Florida Temporary Income Bridge").

As stated in Count I of the complaint, the Plaintiff Class argues that 8 U.S.C. § 1612 unconstitutionally discriminates against them

due to their non-citizen status. Therefore, they request this Court to (1) declare 8 U.S.C. § 1612 unconstitutional and (2) order that 8 U.S.C. § 1612 not be enforced. Through the Motion for a Preliminary Injunction, the Plaintiff Class has requested that 8 U.S.C. § 1612 not be enforced during the pendency of this action. The plaintiffs submitted an appendix of materials in support of their motion for a preliminary injunction. This appendix contains the declarations of over 30 individuals as well as other reports, statistics and data. Defendants have moved to dismiss the entire complaint. The Court held a hearing on the instant matters on July 15, 1997.

## II. THE WELFARE REFORM ACT

### A. Statement of Government Purpose in Enacting the Welfare Reform Act

In 8 U.S.C. § 1601, Congress set forth statements concerning the policies and purposes of the Welfare Reform Act. Congress stated as follows:

§ 1601. Statements of national policy concerning welfare and immigration

The Congress makes the following statements concerning national policy with respect to welfare and immigration:

(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

(2) It continues to be the immigration policy of the United States that—

(A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their fam-

---

amendments to the Welfare Reform Act. However, the SSA's new policies based on the recent amendments may not be available until late October or mid-November. Therefore, the Court will assume that the POMS Policy is still valid for the purposes of this opinion.

7. Approximately 83% of all immigrants receiving SSI or AFDC in 1993 resided in California, New York, Florida or Texas. *February 1995 GAO Report* at p. 7.

8. Originally, this program was to provide replacement SSI and Food Stamp benefits to cer-

tain members of the Plaintiff Class. At that time, the State of Florida appropriated $23,000,000, for that purpose. However, subsequent to the enactment of Florida's Bridge Program, the federal government amended the Welfare Reform Act to reinstate SSI benefits to most individuals. As a result, the Florida legislature amended the Bridge Program as described above. This program is a temporary measure that will distribute Food Stamp benefits to certain members of the Plaintiff Class who are 65 years of age or older. These benefits will terminate on June 30, 1998. *See* The Florida Temporary Income Bridge.

ilies, their sponsors, and private organizations, and

(B) the availability of public benefits not constitute an incentive for immigration to the United States.

(3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.

(4) Current eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

(7) With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits in this chapter, a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

8 U.S.C.A. § 1601 (West Electronic Update Approved 6/27/97).

## B. *Relevant Provisions of the Welfare Reform Act*

The Welfare Reform Act states in pertinent part:

§ 1612. Limited eligibility of qualified aliens for certain Federal programs

(a) Limited eligibility for specified Federal programs

(1) In general

Notwithstanding any other provision of law and except as provided in paragraph (2), an alien who is a qualified

alien (as defined in section [1641] of this title) is not eligible for any specified Federal program (as defined in paragraph (3)).

8 U.S.C.A. § 1612 (West Electronic Update Approved 6–27–97).

A qualified alien is defined as follows:

§ 1641. Definitions

\* \* \* \* \* \*

(b) Qualified alien

For purposes of this chapter, the term "qualified alien" means an alien who, at the time the alien applies for, receives, or attempts to receive a Federal public benefit, is—

(1) an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act [8 U.S.C.A. § 1101 *et seq.*],

(2) an alien who is granted asylum under section 208 of such Act [8 U.S.C.A. § 1158],

(3) a refugee who is admitted to the United States under section 207 of such Act [8 U.S.C.A. § 1157],

(4) an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C.A. § 1182(d)(5) ] for a period of at least 1 year,

(5) an alien whose deportation is being withheld under section 243(h) of such Act (as in effect immediately before the effective date of section 307 of division C of Public Law 104–208) or section 241(b)(3) of such Act (as amended by section 305(a) of division C of Public Law 104–208);

(6) an alien who is granted conditional entry pursuant to section 203(a)(7) of such Act 'as in effect prior to April 1, 1980 [8 U.S.C.A. § 1153(a)(7) ] or

(7) an alien who is a Cuban or Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980).[9]

8 U.S.C.A. § 1641(b), *as amended by,* P.L. 105–33 §§ 5302 and 5562 (August 5, 1997).

---

**9.** Subsection (7) was added by P.L. 105–33 § 5302 and Subsection (5) was amended by P.L.

105–33 § 5562.

8 U.S.C. § 1612(a)(3) defines a specified Federal program as follows:

> (3) Specified Federal program defined
>
> For purposes of this chapter, the term "specified Federal program" means any of the following:
>
> (A) SSI
>
> The supplemental security income program under title XVI of the Social Security Act [42 U.S.C.A. § 1381 et seq.], including supplementary payments pursuant to an agreement for Federal administration under section 1616(a) of the Social Security Act [42 U.S.C.A. § 1382e(a)] and payments pursuant to an agreement entered into under section 212(b) of Public Law 93–66.
>
> (B) Food stamps
>
> The food stamp program as defined in section [2012(h) of Title 7].

8 U.S.C.A. § 1612(a)(3) (West Electronic Update Approved 6/27/97).

Congress provided pursuant to 8 U.S.C.A. § 1612(a)(2)(A)—(C), *as amended by*, P.L. 105–33 §§ 5302, 5306, and 5562 that only the following legal aliens remain eligible for SSI and Food Stamp benefits:

1. refugees, asylees, certain aliens who had their deportation withheld, aliens who were granted status as Cuban or Haitian entrants, and certain Amerasian immigrants are permitted to receive SSI benefits for seven (7) years and Food Stamp benefits for five (5) years after they obtain such status; [10]

2. lawful permanent residents who have worked 40 qualifying quarters may obtain SSI and Food Stamp benefits; and

3. legal aliens who are honorably discharged from or who are on active duty in the Armed Forces of the United States and who have fulfilled active duty requirements (and their spouses, unmarried surviving spouses or unmarried dependent children) may obtain SSI and Food Stamp benefits. [11]

In addition, Congress recently provided that the following legal aliens remain eligible for SSI benefits only:

1. legal aliens who were lawfully residing in the United States and who were receiving SSI benefits on August 22, 1996 [12];

2. an alien who—(i) was lawfully residing in the United States on August 22, 1996; and (ii) is blind or disabled, as defined in section 1614(a)(2) or 1614(a)(3) of the Social Security Act (42 U.S.C. 1382c(a)(3)) [13];

3. Certain American Indians [14]; and

4. Certain SSI beneficiaries who are receiving benefits pursuant to an application that was filed before January 1, 1979. [15]

Pursuant to 8 U.S.C.A. § 1612(a)(2)(D), Congress provided that SSI benefits would terminate for all other legal aliens on Sep-

---

**10.** 8 U.S.C.A. § 1612(a)(2)(A), *as amended by*, P.L. 105–33 §§ 5302 and 5306.

**11.** 8 U.S.C.A. § 1612(a)(2)(A)—(C), *as amended by*, P.L. 105–33 §§ 5302, 5306, and 5562 (August 5, 1997).

**12.** 8 U.S.C.A. § 1612, *as amended by*, P.L. § 5301 (August 5, 1997). This section will be codified at 8 U.S.C.A. § 1612(a)(2)(E) and will state as follows:

> (E) Aliens receiving SSI on August 22, 1996.—With Respect to eligibility for benefits for the program defined in paragraph (3)(A) (relating to the supplemental security income program), paragraph (1) shall not apply to an alien who is lawfully residing in the United States and who was receiving such benefits on August 22, 1996.

**13.** 8 U.S.C.A. § 1612(a)(2), *as amended by*, P.L. 105–33 § 5301 (August 5, 1997). This section

will be codified at 8 U.S.C.A. § 1612(a)(2)(F) and will state as follows:

> (F) Disabled aliens lawfully residing in the United States on August 22, 1996.—With respect to eligibility for benefits for the program defined in paragraph (3)(A) (relating to the supplemental security income program), paragraph (1) shall not apply to an alien who—(I) was lawfully residing in the United States on August 22, 1996; and (ii) is blind or disabled, as defined in section 1614(a)(2) or 1614(a)(3) of the Social Security Act (42 U.S.C. 1382c(a)(3)).

**14.** 8 U.S.C.A. § 1612(a)(2), *as amended by*, P.L. 105–33 § 5303 (August 5, 1997). This section will be codified at 8 U.S.C.A. § 1612(a)(2)(G).

**15.** 8 U.S.C.A. § 1612(a)(2), *as amended by*, P.L. 105–33 § 5304 (August 5, 1997). This section will be codified at 8 U.S.C.A. § 1612(a)(2)(H).

tember 30, 1998 [16] and Food Stamp benefits would terminate for all other legal aliens on August 22, 1997 [17].

### III. Standards for Dismissal

A motion to dismiss is appropriate when it is demonstrated "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### IV. Motion to Dismiss Count I: Violations of Equal Protection Rights Under the Fifth Amendment

#### A. Equal Protection Standards in General

In order to avoid dismissal, Count I must set forth a viable claim that 8 U.S.C. § 1612 violates the Plaintiff Class' equal protection rights under the Fifth Amendment of the United States Constitution.

The Fifth Amendment states as follows:

Amendment V. Grand Jury Indictment for Capital Crimes; Double Jeopardy; Self–Incrimination; Due Process of Law; Just Compensation for Property

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, *nor be deprived of life, liberty, or property, without due process of law;* nor shall private property be taken for public use, without just compensation. (Emphasis Added).

■ Although the Fifth Amendment does not have an equal protection clause, equal protection rights are incorporated into the Fifth Amendment through the above-quoted due process clause. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975).[18]

**16.** See 8 U.S.C.A. § 1612(a)(2)(D), *as amended by*, P.L. 105–33 § 5301 (August 5, 1997), which states in pertinent part:

(D) Transition for aliens currently receiving benefits
(i) SSI
(I) In general
With respect to the specified Federal program described in paragraph (3)(A), during the period beginning on August 22, 1996 and ending on September 30, 1998, the Commissioner of Social Security shall redetermine the eligibility of any individual who is receiving benefits under such program as of August 22, 1996 and whose eligibility for such benefits may terminate by reason of the provisions of this subsection.
(II) Redetermination criteria
With respect to any redetermination under subclause (I), the Commissioner of Social Security shall apply the eligibility criteria for new applicants for benefits under such program.
(III) Grandfather provision
The provisions of this subsection and the redetermination under subclause (I), shall only apply with respect to the benefits of an individual described in subclause (I) for months beginning on or after September 30, 1998.
(IV) Notice
Not later than March 31, 1997, the Commissioner of Social Security shall notify an individual described in subclause (I) of the provisions of this clause.

**17.** See § 1612(a)(2)(D)(ii) which states in pertinent part:
(ii) Food stamps

(I) In general
With respect to the specified Federal program described in paragraph (3)(B), ineligibility under paragraph (1) shall not apply until April 1, 1997, to an alien who received benefits under such program on August 22, 1996, unless such alien is determined to be ineligible to receive such benefits under the Food Stamp Act of 1977 [7 U.S.C.A. § 2011 et seq.]. The State agency shall recertify the eligibility of all such aliens during the period beginning April 1, 1997, and ending August 22, 1997.
(II) recertification criteria
With respect to any recertification under subclause (I), the State agency shall apply the eligibility criteria for applicants for benefits under such program.
(III) Grandfather provision
The provisions of this subsection and the recertification under subclause (I) shall only apply with respect to the eligibility of an alien for a program for months beginning on or after the date of recertification, if on August 22, 1996 the alien is lawfully residing in any State and is receiving benefits under such program on August 22, 1996.

**18.** Equal protection rights are protected against the State governments through the Fourteenth Amendment of the United States Constitution.

Equal protection rights are protected against the federal government through the Fifth Amendment of the United States Constitution. In the instant action, plaintiffs must invoke their Fifth Amendment rights because they are challenging

Equal protection rights restrict Congress' ability to enact laws that (1) discriminate against certain classes of people or (2) burden basic freedoms which are considered to be fundamental rights of an individual. *See City of Cleburne, et al. v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 16, 93 S.Ct. 1278, 1287, 36 L.Ed.2d 16 (1973), *reh'g. den.,* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). If Congress enacts a law that discriminates against a suspect class (e.g., race) or burdens a fundamental right (e.g., voting), then the government must show that the law is narrowly tailored to a compelling government interest. *See San Antonio,* 411 U.S. at 16, 93 S.Ct. at 1287; *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. This is known as the strict scrutiny test. If Congress enacts a law that discriminates against a semi-suspect class (e.g., gender), the government must show that the law is substantially related to an important government interest. *City of Cleburne,* 473 U.S. at 440–41, 105 S.Ct. at 3254–55. This is known as the heightened or mid-level scrutiny test. However, if Congress enacts a law that does not affect a fundamental right or a suspect (or semi-suspect) classification, the government only needs to show that the law is rationally related to a legitimate governmental purpose. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 8, 94 S.Ct. 1536, 1540, 39 L.Ed.2d 797 (1974); *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. This is known as the rational basis test.

### B. Federal vs. State Regulation of Aliens

■ Pursuant to Article I, Section 8 of the United States Constitution, Congress has been granted the power "To establish an uniform Rule of Naturalization." The United States Supreme Court has broadly interpreted this power to include the authority to regulate not only the conditions of entry and residence of aliens, but also the conduct of aliens in the country. *See Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013, *aff'd,* 214 U.S. 344, 29 S.Ct. 678, 53 L.Ed. 1024 (1909) (over no conceivable subject is the legislative power of Congress more complete than it is over immigration); *see Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976) (holding that Congress' broad power over naturalization and immigration encompasses the power to condition an alien's eligibility for participation in a federal medical insurance program); *Graham v. Richardson,* 403 U.S. 365, 377, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534 (1971) (quoting *Takahashi v. Fish & Game Comm'n.,* 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478 (1948)).

■ Given Congress' plenary power over immigration, the courts have uniformly held that federal laws which regulate aliens must only be rationally related to a legitimate governmental purpose in order to withstand scrutiny. *Mathews,* 426 U.S. at 83, 96 S.Ct. at 1893; *Moving Phones Partnership v. Federal Communications Commission,* 998 F.2d 1051, 1056 (D.C.Cir.1993), *cert. den. sub. nom., Cellswitch v. FCC,* 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994); *Abreu v. Callahan,* 971 F.Supp. 799, 1997 WL 414113, *11 (S.D.N.Y.1997).

In arguing for a rational basis test, defendants rely primarily on *Mathews.* In this case, the Court upheld federal regulations which excluded aliens from participation in the Medicare Part B supplemental medical insurance program [19] unless the alien had been admitted for permanent residence and had resided in the United States for at least 5 years. *Mathews,* 426 U.S. at 69, 96 S.Ct. at 1886. The Court found that these federal requirements were valid restrictions on aliens since neither requirement was "wholly irrational". *Mathews,* 426 U.S. at 84, 96 S.Ct. at 1893. In reaching its decision, the Court noted that the classifications created by the federal government distinguished be-

---

laws that were enacted by the federal government.

**19.** Medicare Part B medical insurance program covers a part of the cost of certain physicians' services, home health care, outpatient physical therapy and other medical and health care. The Part B program supplements Part A hospital insurance. *Mathews,* 426 U.S. at 70 n. 1, 96 S.Ct. at 1886 n. 1.

tween different groups of aliens, not just between citizens and aliens. *Mathews*, 426 U.S. at 80, 96 S.Ct. at 1892. The Court found that Congress could create sub-classes within the alien population for the purpose of determining Medicaid eligibility requirements. *Mathews*, 426 U.S. at 82–83, 96 S.Ct. at 1892–93.

Furthermore, the *Mathews* court acknowledged that the immigration policy had been committed to the political branches of the federal government. The Court stated as follows:

> Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.
>
> \* \* \* \* \* \*
>
> Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

*Mathews*, 426 U.S. at 81–82, 96 S.Ct. at 1892.

■ In contrast, state regulations of aliens are subject to strict scrutiny. *Graham*, 403 U.S. at 372, 91 S.Ct. at 1852 (court that struck down state welfare laws applied strict scrutiny review because alien-plaintiffs were a suspect class); *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254.

This difference in standards is attributable to the fact that state governments do not possess the same interest in or power over immigration matters as does the federal government. The *Mathews* case explained this distinction as follows:

> Insofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country. Both groups are noncitizens as far as the State's interest in administering its welfare programs are concerned. Thus, a division by a State of the category of persons who are not citizens of that State into subcategories of United States citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business.
>
> \* \* \* \* \* \*
>
> Contrary to appellees' characterization, it is not 'political hypocrisy' to recognize that the Fourteenth Amendment's limits on state powers are substantially different from the constitutional provisions applicable to the federal power over immigration and naturalization.

*Mathews*, 426 U.S. at 85 and 86—87, 96 S.Ct. at 1894 and 1895.

■ In the instant action, the plaintiffs are challenging 8 U.S.C. § 1612 of the Welfare Reform Act which is a federal measure affecting aliens' rights to receive federal welfare benefits. As in the *Mathews* case, 8 U.S.C. § 1612 pertains to sub-groups of aliens, not just groups that distinguish between citizens and aliens. Section 1612 declares that some legal aliens are eligible for SSI and food stamp benefits, while other legal aliens are not eligible. As in *Mathews*, Congress has the authority to make such distinctions, and such Congressional action only warrants a rational basis review by the Courts.

Citing to *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217–19, 115 S.Ct. 2097, 2108, 132 L.Ed.2d 158 (1995), the plaintiffs have argued that federal and state laws regulating aliens should be subject to the same strict scrutiny review. In *Adarand*, the Court reviewed the constitutionality of a federal affirmative action plan which permitted minorities to obtain favorable treatment on the basis of race. An individual who did not benefit from the affirmative action plan argued that the plan violated his equal protection rights under the Fifth Amendment under the strict scrutiny test. *Adarand*, 515 U.S. at 200–04, 115 S.Ct. at 2101. The proponents of the plan argued that strict scrutiny did not apply because the federal government was not subject to the same strict

scrutiny under the Fifth Amendment as were the states under the Fourteenth Amendment. *Adarand,* 515 U.S. at 211–13, 115 S.Ct. at 2105. The *Adarand* court held that the federal government was subject to the same strict scrutiny test as the state governments when a racial classification was at issue. *Adarand,* 515 U.S. at 235–37, 115 S.Ct. at 2117. However, in its analysis, the *Adarand* court also acknowledged that certain other cases would require a different analysis when they involved matters in which special deference was to be given to the political branches of the federal government. *Adarand,* 515 U.S. at 217–19, 115 S.Ct. at 2108; *see also Abreu v. Callahan,* 971 F.Supp. 799, 812 n. 84. Therefore, plaintiffs are not entitled to a strict scrutiny review of 8 U.S.C. § 1612 pursuant to *Adarand.*

### C. *Essential Welfare Benefits vs. Fundamental Rights*

As mentioned above, courts have applied a heightened or mid-level scrutiny test when evaluating certain laws affecting semi-suspect classifications. *City of Cleburne,* 473 U.S. at 440–41, 105 S.Ct. at 3254–55.

Plaintiffs have argued that this heightened scrutiny test should be applied in the instant action because the Welfare Reform Act affects important life sustaining benefits to aliens.

It is well settled that the receipt of welfare benefits does not implicate a fundamental right for the purposes of equal protection law. *Village of Belle Terre,* 416 U.S. at 8, 94 S.Ct. at 1540; *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254.

However, plaintiffs have argued for a heightened scrutiny test based on certain equal protection cases which discuss the regulation of welfare benefits to aliens. *See Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978); *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), *reh'g. den.,* 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982) *and reh'g. den. sub. nom., Texas v. Certain Named & Unnamed Undocumented Alien Children,* 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982); *Moving Phones Partnership L.P. v. F.C.C.,* 998 F.2d 1051 (D.C.Cir.1993), *cert. den. sub. nom.; Cellswitch v. F.C.C.,* 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994).

These cases contain language which suggests that a heightened scrutiny test may be used when states deny essential welfare benefits (as opposed to non-essential welfare benefits) to aliens. However, each of these cases acknowledges that federal alienage classifications are evaluated differently than state alienage classifications.

For example, in the *Foley* case, the Court upheld state laws that prohibited aliens from becoming members of the state police force. *Foley,* 435 U.S. at 293, 98 S.Ct. at 1069. The Court reasoned that only a rational basis test was required when the state excluded aliens from serving in sensitive governmental positions that involved discretionary decision making or the execution of policy which substantially affected members of the political community. *Foley,* 435 U.S. at 296, 98 S.Ct. at 1070—71. In contrast, the *Foley* court found that a heightened scrutiny test applied when states restricted the availability of essential benefits to aliens. *Foley,* 435 U.S. at 294, 98 S.Ct. at 1070. The *Foley* court stated in pertinent part:

> [B]eginning with a case which involved the denial of welfare assistance essential to life itself, the Court has treated certain restrictions on aliens with "heightened judicial solicitude," a treatment deemed necessary since aliens—pending their eligibility for citizenship—have no direct voice in the political processes. Following *Graham,* a series of decisions have resulted requiring state action to meet close scrutiny to exclude aliens as a class from educational benefits, eligibility for a broad range of public employment, or the practice of licensed profession. These exclusions struck at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional determination to admit the alien to permanent residence.

*Foley,* 435 U.S. at 294, 98 S.Ct. at 1070 (citations omitted).

In the *Plyler* case, the Court took this idea one step further when it struck down state regulations that restricted important educational benefits to *illegal* aliens. *See Plyler,* 457 U.S. at 230, 102 S.Ct. at 2401–02. In *Plyler,* children of illegal aliens were denied

a public education by the State of Texas. *Plyler*, 457 U.S. at 205, 102 S.Ct. at 2388. The Court found that the children did not constitute a suspect class because they were illegal aliens. *Plyler*, 457 U.S. at 223, 102 S.Ct. at 2398. In addition, the Court found that a public education was not a fundamental right. *Id.* Notwithstanding these findings, the Court struck down the State statutes at issue as violative of the Fourteenth Amendment, based on the idea that education was a very important right (although not a fundamental right), and that the class of children were unable to affect their own status or the actions of their parents (even though the children were not a suspect or semi-suspect class). *See id.* The Court also found that the restrictive state education laws were not compelled or supported by any broad federal immigration policy. *Plyler*, 457 U.S. at 226, 102 S.Ct. at 2399.

As demonstrated in their opinions, both *Foley* and *Plyler* acknowledge that a heightened standard of review is applicable when state, rather than federal, alienage laws are at issue. *See Foley*, 435 U.S. at 294–95, 98 S.Ct. at 1070 *and Plyler*, 457 U.S. at 226, 102 S.Ct. at 2399.

In addition, the *Moving Phones* case upheld federal restrictions on aliens in the communications industry pursuant to a rational basis test. *Moving Phones*, 998 F.2d at 1056. First, citing to *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the *Moving Phones* court found that "classifications based on alienage in federal statutes are permissible so long as the challenged statute is not a 'wholly irrational' means of effectuating a legitimate government purpose." *Moving Phones*, 998 F.2d at 1056. Second, the *Moving Phones* court found that

the "essential benefits" analysis used by the Court in *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) was not applicable because the Federal Communications Commission regulations at issue did not involve essential welfare benefits. *Moving Phones*, 998 F.2d at 1056. Having determined that *Foley* was inapposite, the *Moving Phones* court further noted that *Foley* was distinguishable because it involved state, rather than federal action. *Moving Phones*, 998 F.2d at 1056 n. 3. The *Moving Phones* case also noted that state restrictions on essential welfare benefits were objectionable when they were inconsistent with federal policy concerning aliens. *See id.* However, these issues were not thoroughly analyzed by the *Moving Phones* court since the Court found that essential welfare benefits were not at issue in the case before it or in the *Mathews* case. *See id.*[20] Thus, although it raised many issues, *Moving Phones* did not create a new heightened scrutiny test for federal laws which regulate aliens.

Based on the above, this Court finds that, *Foley, Plyler* and *Moving Phones*, do not entitle plaintiffs to a heightened scrutiny review of 8 U.S.C. § 1612.

### D. Application of the Rational Basis Test to the Case At Bar

As stated above, this Court has found no basis upon which to apply a strict scrutiny or heightened scrutiny test. Therefore, the Court evaluates 8 U.S.C. § 1612 under the rational basis test pursuant to the *Mathews* case.

Pursuant to the rational basis test, 8 U.S.C. § 1612 must be rationally related to a legitimate government purpose.

---

20. The *Moving Phones* court stated as follows:

We note that *Foley* involves state, rather than federal, regulation of aliens. Even so, for the purposes of this case, that fact represents a distinction without a difference. The denial of Medicare benefits which survived the rational basis test in *Mathews* could well withstand the *Foley* analysis, which applied strict scrutiny to "exclusions [which] struck at the noncitizens' ability to exist in the community," 435 U.S. at 295, 98 S.Ct. at 1070, based on the court's conclusion that such exclusions "were inconsistent with the congressional determination to admit the aliens to permanent residence." *Id.* In fact, the facets of community life from

which aliens may not be excluded, including eligibility for public employment, educational benefits, or "welfare assistance essential to life itself," are those that, if withheld, would directly cause economic dependance or physical harm. In contrast, receipt of Medicare benefits, while desirable, might legitimately be considered a perquisite of citizenship, insofar as a government's decision not to extend such benefits to aliens does not necessarily involve withholding of essential welfare assistance, as would, for example, the denial of food stamps or emergency services at a hospital. *Moving Phones*, 998 F.2d at 1056 n. 3.

The defendants have asserted several legitimate grounds for the enactment of 8 U.S.C. § 1612. They include the following:

1. Encouraging aliens to be self-reliant, or to rely on their own capabilities and the resources of their families, their sponsors and private organizations, rather than becoming public charges.
2. Reducing the costs of the SSI and Food Stamp programs.
3. Removing welfare as an incentive for both legal and illegal immigration.
4. Encouraging aliens to naturalize.

Plaintiffs argue that 8 U.S.C. § 1612 does not accomplish its purported goals as follows:

1. 8 U.S.C. 1612 will not make plaintiffs more self-reliant because their disabilities will not disappear and 8 U.S.C. § 1612 will not make plaintiffs more capable of supporting themselves.
2. Favoring citizens to aliens in the distribution of welfare benefits is not a legitimate goal pursuant to the law. In addition, such favoritism is unfair because legal aliens pay taxes that contribute to these programs.
3. 8 U.S.C. § 1612 will not deter illegal immigration because depriving benefits to legal aliens does not have an impact on individuals who come into the country illegally.
4. 8 U.S.C. § 1612 will not encourage naturalization in this population because many of the Plaintiff Class members are physically unable to naturalize because of their age and physical disabilities.

■ Although there must be a connection to an actual legitimate governmental purpose, a classification "does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), *reh'g. den.*, 398 U.S. 914, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970), (citing *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369).

■ This Court finds that the reasons articulated by defendants for the enactment of 8 U.S.C. § 1612 are legitimate governmental purposes. *Abreu*, 971 F.Supp. 799, 815–20 (court found that the following were legitimate governmental purposes: (1) encouraging naturalization, (2) encouraging self-sufficiency, (3) fiscal savings, and (4) removing an incentive for immigration).

Moreover, although 8 U.S.C. § 1612 may not be a perfect method for effectuating the governmental purposes listed above, it is a sufficient method for doing so. This is particularly true in light of Congress' most recent amendments to 8 U.S.C. § 1612, which have expanded the class of legal aliens that are still eligible for SSI benefits. In light of the above, the Court finds that 8 U.S.C. § 1612 is constitutional. Therefore, it is hereby ordered that Count I of the complaint must be DISMISSED.

## V. PLAINTIFFS' MOTION FOR AN INJUNCTION BASED ON COUNT I OF THE COMPLAINT

Based on count I of the complaint, plaintiffs have requested an injunction to prohibit the enforcement of 8 U.S.C. § 1612 during the pendency of this action. In light of the fact that Count I has been dismissed, Plaintiffs' Motion for Preliminary Injunction must be DENIED.

## VI. MOTION TO DISMISS COUNTS II and III: VIOLATIONS OF THE ADMINISTRATIVE PROCEDURES ACT

Defendants have also moved to dismiss Counts II and III of the complaint. In these Counts the Florida State Plaintiffs and Dade County seek to invalidate the above-mentioned POMS Policy because it allegedly violates the Administrative Procedures Act ("APA").

### A. The Application Process for SSI and Food Stamp Benefits

Applications for SSI and Food Stamp benefits often take a lengthy time to process. When an individual does receive a favorable determination, he is awarded benefits back to the date of his application. 20 C.F.R. § 501. To provide for this lag time between the application and the award, the federal Department of Health and Human Services pur-

suant to 42 U.S.C. § 1383(g) contracts with states (and counties) for the provision of interim assistance benefits. In the instant action, a Reimbursement Agreement is in effect between the SSA Commissioner and the State of Florida (including Dade County) pursuant to 42 U.S.C. § 1383(g). This agreement is attached as Exhibit D to Defendants' Memorandum in Support of Their Motion to Dismiss Plaintiffs' Claims (DE 33). Pursuant to 42 U.S.C. § 1383(g) and the Reimbursement Agreement, the State of Florida and Dade County is to provide interim benefits to qualified applicants. The federal government is then to send the first lump sum award of an individual's benefits to the State (or County). The State of Florida (or Dade County) is to reimburse itself from this lump sum award and send any excess benefits to the applicant.

However, as stated above, the SSA issued its POMS Policy. Under this policy, individuals who had applications pending before August 22, 1996, were to be denied benefits unless they also had a favorable Social Security determination on their application before August 22, 1996. Consequently, any interim assistance provided to individuals who did not receive a favorable determination by August 22, 1996, would not be reimbursed to the State of Florida or Dade County.

In counts II and III, the State of Florida and Dade County argue that the POMS Policy is a violation of the APA.

### B. Provisions of the APA

The APA states in pertinent part:

§ 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

\* \* \* \* \* \*

§ 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

\* \* \* \* \* \*

### C. The POMS Policy

The POMS Policy states as follows:

The following individuals are considered to have been "Receiving SSI benefits on 8/22/96":

- recipients in current pay on 8/22/96, including payment status NO1 recipients in section 1619(b) status, and

- individuals in nonpay, suspense, and payment status EO1 on 8/22/96, and

- claimants for whom a field office (FO) input had been made on or before 8/22/96 to allow an initial claim or reverse the prior determination on a denied claim, even if the input rejected, and

- claimants for whom a Disability Determination Service (DDS) had issued a favorable initial claim or reconsideration disability determination on or before 8/22/96, whether or not the FO had com-

pleted nondisability development ·or effectuated payment, and

- claimants for whom an administrative law judge (ALJ) or the Appeals Council (AC) had issued a fully or partially favorable decision on or before 8/22/96, whether or not the FO had completed nondisability development or effectuated payment, and
- claimants with appeals pending after ·8/22/96 on claims on which a fully or partially favorable allowance was issued on or before 8/22/96, and
- claimants for whom a presumptive disability determination had been made on or before 8/22/96.

\*　\*　\*　\*　\*　\*

2. Aliens Not Considered to Be "Receiving SSI Benefits on 8/22/96"

Aliens with claims and appeals of denied claims that do not meet the requirements in 1. above are subject to the eligibility rules in SI 00502.100 for the entire period in the life of the application (SI 00601–.010C.), including months before August 1996.

\*　\*　\*　\*　\*　\*

### D.　Count II: Violation of APA (Abuse of Discretion )

In Count II, the State of Florida and Dade County argue that the POMS Policy is contrary to law and arbitrary and capricious in violation of the APA because it requires 8 U.S.C. § 1612 to be applied retroactively in violation of *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) and *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Defendants argue that the POMS Policy is not retroactive because it merely applies the current law (the Welfare Reform Act) at the time that the SSA makes a benefits determination. Therefore, defendants argue that the POMS Policy is a proper application of 8 U.S.C. § 1612 under *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

### 1.　The Bowen Rule

■ In the case of *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), the Court set forth the general rule that laws should not be applied retroactively. The *Bowen* case involved the federal Health & Human Services Department's attempt to retroactively impose cost-limit rules in the Medicaid program that resulted in the recoupment of monies from hospitals. Under *Bowen,* the general rule is as follows:

> Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.

*Bowen,* 488 U.S. at 208, 109 S.Ct. at 471.

### 2.　The Bradley Rule

■ Defendants primarily rely on *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) to argue that the POMS Policy was a proper application of 8 U.S.C. § 1612. The *Bradley* case involved the application of new law (a statutory provision permitting attorneys' fees to the prevailing party in school desegregation cases) to a case that was pending on appeal. Under *Bradley,* the general rule is as follows:

> [T]hat a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.

*Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016.

This general rule applies with equal force to changes that are made by administrative agencies acting pursuant to legislative authorization. *Bradley,* 416 U.S. at 715, 94 S.Ct. at 2018.

However, a significant exception to this general rule exists to prevent a manifest injustice. *Bradley,* 416 U.S. at 716, 94 S.Ct. at 2019. The factors that must be considered to prevent a manifest injustice are as follows: (1) the nature and identity of the parties; (2) the nature of their rights; and (3) the nature of the impact of the change in law upon those rights. *Bradley,* 416 U.S. at 717, 94 S.Ct. at 2019.

In evaluating factor No. 1 above, the Court should consider whether the parties are merely private parties or whether the issues at hand affect public or national concerns.

*Bradley,* 416 U.S. at 719, 94 S.Ct. at 2020. If national concerns are at issue, applying *Bradley* is less likely to produce a manifest injustice than if the dispute merely concerns private parties. *Id.*

In evaluating factor No. 2, the Court should consider whether or not the rights at issue are matured, unconditional or vested rights. *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020. If the rights are matured or vested, it is more likely that a manifest injustice will be present by applying *Bradley. Id.*

In evaluating factor No. 3, the Court should consider the impact of the changing law upon existing rights, i.e., will "unanticipated obligations ... be imposed upon a party without notice or an opportunity to be heard." *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020–21.

### 3. The Landgraf Rule

The case of *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) analyzes the apparent tension between the *Bowen* and *Bradley* rules. In settling this apparent tension, the *Landgraf* case states:

> The conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have 'sound instinct[s]' and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Landgraf,* 511 U.S. at 268–70, 114 S.Ct. at 1499.

In further discussing this apparent tension, the *Landgraf* court also noted that *Bradley* did not intend to displace the "traditional presumption against applying statutes affecting substantive rights, liabilities or duties to conduct arising before their enactment." *Landgraf,* 511 U.S. at 278, 114 S.Ct. at 1504.

The touchstone in these cases appears to be Congressional intent and the idea of settled expectations.

In making this clear, *Landgraf* stated as follows:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf,* 511 U.S. at 280–81, 114 S.Ct. at 1505.

■ In the case at bar, the defendants have argued that Congress provided that the Welfare Reform Act would be applied to applications that were pending, but not ruled upon as of August 22, 1996. The defendants argue that Congress' intent is made clear through 8 U.S.C. §§ 1612(a)(1), 1641, and 1612(a)(2)(D). First, defendants read 8 U.S.C. §§ 1612(a)(1) and 1641 as prohibiting any payment of benefits to qualified aliens after August 22, 1996. Defendants further argue that the only qualified aliens who are excepted from this general rule are those enumerated in 8 U.S.C. § 1612(a)(2)(D), which provides that "the Commissioner of Social Security shall redetermine the eligibility of any individual who is receiving benefits under such program as of August 22, 1996." According to defendants, if Congress wanted to pay benefits to aliens who had pending applications as of August 22, 1996, it would have written another exception into the Welfare Reform Act, specifically addressing aliens who had applications pending as of August 22, 1996. In addition, the defendants assert that such a reading of the Welfare

Reform Act is consistent with Congress' intent of encouraging aliens to be self-sufficient.

However, the language of the Welfare Reform Act does not support defendants' arguments. Under 8 U.S.C. §§ 1612(a)(1) and 1641, payments to aliens are not prohibited. Rather, qualified aliens are deemed ineligible to receive SSI and Food Stamp benefits. Qualified aliens include "an alien who, at the time the alien applies for, receives, or attempts to receive a Federal public benefit" is (1) a permanent resident, (2) an asylee, (3) a refugee, (4) an alien paroled into the United States for at least one year, (5) an alien whose deportation has been withheld, (6) an alien who has been granted conditional entry, and (7) an alien who is a Cuban or Haitian entrant. 8 U.S.C. § 1641. Under 8 U.S.C. § 1612(a)(2)(D), the Commissioner is to redetermine the eligibility of aliens who are receiving benefits as of August 22, 1996. Nothing in these provisions addresses or prohibits payments of benefits that were due prior to August 22, 1996.

Since there is no clear congressional intent favoring the defendants' proposed application of the Welfare Reform Act, the Court must consider whether or not the POMS policy has a retroactive effect pursuant to *Landgraf*. This requires the Court to evaluate the following factors: (1) whether a party's rights have been impaired; (2) whether a party's liability has been increased; and (3) whether new duties have been imposed on a party.

The Court finds that the POMS Policy does have a retroactive effect pursuant to *Landgraf*. Contrary to defendants' arguments, an entitlement or vesting of benefits is not contingent on an adjudication by the SSA Commissioner. " 'Both in legal and general usage, the normal meaning of entitlement includes a right or benefit for which a person qualifies, and it does not depend upon whether the right has been acknowledged or adjudicated. It means only that the person satisfies the prerequisites attached to the right.' " *Teitelbaum v. Chater*, 949 F.Supp. 1206, 1211 (E.D.Pa.1996) (court found that amendments to Social Security Act which barred disability benefits to alcoholics and drug addicts could not be applied if drug and alcohol related disabilities arose before amendments, even if SSA Commissioner did not adjudicate such rights before the amendments were enacted), *citing to, Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477, 112 S.Ct. 2589, 2595, 120 L.Ed.2d 379 (1992), *but see Sprouse v. Schweiker*, 677 F.2d 1029, 1030 (4th Cir.1982). Furthermore, pursuant to 20 C.F.R. § 416.501, applicants are entitled to benefits from the date of their applications, not the date of the SSA's adjudication.

In addition, because the State of Florida and Dade County's reimbursement rights are directly linked to the aliens' accrued benefits, the SSA cannot issue a policy which eliminates those accrued benefits without causing injustice and hardship to the State of Florida and Dade County. Prior to August 22, 1996, the State of Florida and Dade County operated its interim assistance program in accordance with the law in effect at that time. In reliance upon that law, the State of Florida and Dade County expended substantial funds prior to August 22, 1996.[21] By changing the welfare laws retroactively and without notice, the SSA is substantially impairing the rights

---

**21.** Under the Reimbursement Agreement with the SSA, the State of Florida and Dade County were entitled to at least 30 days written notice from the SSA Commissioner before the Reimbursement Agreement could be terminated. The Reimbursement Agreement states in pertinent part:

> The Secretary of Health and Human Services, hereinafter, referred to as the "Secretary," and the State of Florida, hereinafter referred to as the "State," for the purpose of assuring the availability of assistance to meet the basic needs of applicants for benefits under the supplemental security income program, title XVI of the Social Security Act, hereby agree to the following:

ARTICLE I
SCOPE
This Agreement covers reimbursement by the Secretary to the State for assistance furnished by the State to individuals during (a) the months their supplemental security income (SSI) applications are pending, and (b) during the months their SSI benefits have been suspended or terminated, if said individuals are subsequently found to be eligible for SSI benefits for those months.
ARTICLE XI
A. The State or the Secretary may terminate this Agreement at any time upon thirty (30) days written notice to the other party.

of the State of Florida and Dade County and upsetting settled expectations that were based on the law at the time that the State of Florida and Dade County made the interim assistance available.

Therefore, denying aliens' accrued rights and failing to reimburse the State of Florida and Dade County for interim assistance that was expended prior to August 22, 1996, unfairly impairs the rights of aliens and imposes upon the State of Florida and Dade County new duties and increased liability for past conduct in violation of *Landgraf.* Since the POMS Policy causes a retroactive application of the Welfare Reform Act, the POMS Policy cannot govern in the instant action.[22]

Furthermore, even under the *Bradley* rule, the POMS Policy is invalid. As mentioned above, the *Bradley* rule provides that a Court or administrative agency is to apply the law in effect at the time it renders its decision unless doing so would result in a manifest injustice. As demonstrated above, a manifest injustice would be present because the POMS policy affects accrued benefits to aliens and imposes unanticipated obligations on the State of Florida and Dade County.

In light of the above, the Court finds that the POMS Policy is contrary to law and arbitrary and capricious in violation of the APA. Therefore, the Motion to dismiss Count II is DENIED.

### E. Count III: Violation of APA (Rulemaking Authority)

■ Even if it was a valid rule under Count II, the State of Florida and Dade County argue that the POMS Policy is invalid because it was not issued in accordance with the APA's formal rulemaking procedures. Such procedures provide that a substantive rule must be published in the Federal Register and interested parties must be granted an opportunity to comment on the rule. 5 U.S.C. § 553. The State of Florida and Dade County further argue that such rulemaking procedures were required because the POMS Policy is a substantive rule. Defendants argue that the POMS Policy is not subject to the formal APA Rulemaking

procedures because it is an interpretive rule, rather than a substantive rule.

The Court agrees with Dade County that the POMS Policy is a substantive rule because it affects the substantive rights of the parties. *See Brown Express v. U.S.*, 607 F.2d 695, 700 (5th Cir.1979). Accordingly, the POMS Policy was subject to the formal rulemaking authority of the APA. Therefore, the Motion to Dismiss Count III of the Complaint is DENIED.

### VII. MOTION TO DISMISS COUNT IV: BREACH OF CONTRACT

At the hearing held on July 15, 1997, Dade County withdrew Count IV of the Complaint. Therefore, Count IV of the Compliant is hereby DISMISSED.

### VIII. MOTION TO DISMISS COUNT V: VIOLATIONS OF ARTICLE IV, SEC. 4 AND THE TENTH AMENDMENT

■ In Count V, the State of Florida and Dade County allege that Article IV, § 4 and the Tenth Amendment of the United States Constitution has been violated because the Welfare Reform Act essentially forces Florida to pay basic subsistence benefits to individuals who were previously entitled to SSI and Food Stamp benefits. The State of Florida alleges that this violates the Constitution because a disproportionate share of immigrants receiving welfare benefits reside in the State of Florida. (As mentioned above, 83% of all immigrants receiving SSI or AFDC in 1993 resided in California, New York, Florida and Texas.) Therefore, the State of Florida asserts that it is required to pay a disproportionate amount of the cost of replacement benefits to needy individuals due to the harsh effects of the Welfare Reform Act. As a result, Florida argues that the Tenth Amendment has been violated because it is forced to pay these costs by the federal government and Article IV, Section 4 is violated because these costs are an invasion which denies Florida its republican form of government.

---

22. The Court notes that Congress, as opposed to the SSA Commissioner, can provide for retroactive changes to Welfare Benefits. However, Congress must clearly indicate its intent to do so.

Defendants argue that The Welfare Reform Act does not violate the Tenth Amendment or Article VI, Section 4, because the federal government is not compelling the State of Florida to enact any laws to provide replacement welfare benefits and because the claim under Article IV, Section 4 is subject to the political question doctrine.

Based on the case of *Chiles v. United States,* 69 F.3d 1094 (11th Cir.1995), *cert. den.,* —— U.S.——, 116 S.Ct. 1674, 134 L.Ed.2d 777, 64 U.S.L.W. 3762 (1996), the Court finds that defendants' contentions are correct. In *Chiles,* Florida state and local governments brought an action against the United States, the Attorney General and other federal officials alleging that the defendants had failed to enforce immigration policies, thereby causing the state to incur a disproportionate amount of expenses in providing welfare and education benefits to illegal aliens. *See Chiles,* 69 F.3d at 1096. The State of Florida argued that defendants' actions violated the Tenth Amendment and Article IV, Section 4 of the United States Constitution. *Id.* at 1097. The District Court dismissed these claims and the Eleventh Circuit affirmed. In its opinion, the Eleventh Circuit held "that whether the level of illegal immigration is an 'invasion' of Florida and whether this level violates the guarantee of a republican form of government present nonjusticiable political questions." *Chiles,* 69 F.3d at 1097. In addition, with respect to the Tenth Amendment claim, the Eleventh Circuit held, "we agree that Florida's provision of benefits to illegal aliens is not the product of federal coercion of the kind which violates the Tenth Amendment." *Chiles,* 69 F.3d at 1097. Similarly, in the case at bar, whether the level of legal aliens in Florida who are no longer entitled to welfare benefits is an invasion of Florida and whether it rises to the level of denying Florida a republican form of government is a nonjusticiable political question. Furthermore, Florida's provision of welfare benefits to legal aliens who no longer qualify for federal welfare benefits is not the product of federal coercion of the kind which violates the Tenth Amendment. For the reasons stated in *Chiles,* Count V of the Complaint is hereby DISMISSED.

## IX.  CONCLUSION

In light of the above, it is

**ORDERED AND ADJUDGED** as follows:

1.  Defendants' Motion to Dismiss is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to Counts I, IV and V. Therefore, these counts are hereby DISMISSED. The Motion is DENIED as to Counts II and III of the Complaint.

2.  Plaintiffs' Motion for Preliminary Injunction (DE 28) is DENIED.