Lay KIEV, Moua Nhia Koua, Sary Sai, Pangchong Yang, Mee Xiong, Chanh Phomma, on behalf of themselves and others persons similarly situated, Plaintiffs,

v.

Daniel GLICKMAN, Secretary of Agriculture for the United States Department of Agriculture, Defendant.

No. 97–1117 (MJD/AJB).

United States District Court, D. Minnesota.

Jan. 27, 1998.

Todd A. Noteboom, Leonard Street & Deinard, Minneapolis, MN, Lawrence A. Moloney, Doherty Rumble & Butler, Minneapolis, MN, for and on behalf of plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David L. Lillehaug, U.S. Atty., Mary Joe Madigan, Asst. U.S. Atty., Thomas W. Millet, David M. Souders and Pamela J. Aronson, Dept. of Justice for and on behalf of Defendant.

**MEMORANDUM OPINION AND ORDER**

DAVIS, District Judge.

In 1996, the President signed into law the "Personal Responsibility and Work Opportunity Reconciliation Act of 1996." 8 U.S.C. §§ 1601–1645 (hereinafter the "Welfare Reform Act" or the "Act"). Section 402 of the Welfare Reform Act denies, *inter alia,* food stamp benefits to certain legal aliens, refugees and asylees. 8 U.S.C. § 1612(a)(1).[1] The Plaintiffs are lawful permanent residents who are recipients of food stamp benefits and seek to represent a class of "all legal, permanent residents residing in a state within the Eighth Federal Circuit who are eligible for food stamp benefits under the Food Stamp Act of 1964, as amended, but for their status as lawful permanent residents, who were residing in the United States on August 22, 1996, and who have been or will be disqualified from receiving food stamps by operation of Section 402 of the [Welfare Reform Act.]"

Plaintiffs seek to enjoin Defendant from enforcing Section 402 of the Welfare Reform Act on the basis that it violates the equal protection component of the Fifth Amendment by impermissibly distinguishing between lawful permanent residents and citizens. Currently before the Court is Plaintiffs' Motion for a Preliminary Injunction, and for Class Certification. The Defendant moves for dismissal of Plaintiffs Complaint, arguing that this case involves pure legal issues and that the Defendant is entitled to judgment as a matter of law.

*Food Stamp Act*

In 1964, Congress established a federally funded, state administered food stamp program "in order to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011. To be eligible for food stamps, a household's net income cannot exceed the federal poverty line nor can its available resources exceed $2,000, or where a household includes members that are 60 years of age or older, resources cannot ex-

---

1. The limitation of food stamp benefits applies to "qualified aliens" as defined in Section 1641 of the Welfare Reform Act.

ceed $3,000. 7 U.S.C. § 2014(c) and (g). Prior to the passage of the Welfare Reform Act, aliens lawfully permitted to reside in the United States, or who have resided in the United States prior to June 30, 1948 and have continuously maintained their residence here, and who met all other requirements, were eligible for food stamp benefits. 7 U.S.C. § 2015(f).

*The Welfare Reform Act*

Congress enacted the Welfare Reform Act to further the national policy of self sufficiency with respect to welfare and immigration. *See generally,* 8 U.S.C. § 1601. To further such policy, Congress determined that limiting eligibility rules for public assistance would remove incentives for illegal immigration, and would assure that aliens be self-reliant in accordance with national immigration policy. 8 U.S.C. § 1601(5) and (6). Prior to its enactment, welfare reform was the subject of extensive legislative activity. Members of Congress were concerned about the extent to which permanent legal residents were receiving federal public assistance. *See e.g.,* 142 Cong.Rec. H7801 (July 18, 1996) (Rep.English); *Id.,* H7805 (Rep. Dunn). In a report to the House Subcommittee on Human Resources, Committee on Ways and Means, the General Accounting Office determined that the percentage of immigrants who receive federal assistance in the form of Social Security Income ("SSI") or Aid to Families with Dependent Children ("AFDC"), is higher than the percentage of citizens receiving the same benefits—6 percent of all immigrants compared to 3.4 percent of all citizens. GAO Report 95–588 at p. 2 (February 1995). From 1983 to 1993, the number of immigrants receiving SSI quadrupled. *Id.* Furthermore, reports to Congress suggested that the costs of welfare benefits to immigrants would increase from 3.6 billion dollars in 1996 to five billion dollars in the year 2000. GAO Report T–HEHS–96–149 p. 10 (May 1996). By the mid–1990's, 27 million people per month were receiving food stamp benefits at a cost of more than $26 billion per year. 142 Cong.Rec. H7747 (July 17, 1996) (Rep.Goodlatte). In response to these concerns, as well as others, the Welfare Reform Act was enacted.

As noted above, the Section 402 of the Welfare Reform Act places additional eligibility restrictions on non-citizens and permanent legal aliens for specified federal programs, including the food stamp program. Under the Act, qualified aliens may remain eligible for food stamp benefits only if they fall within certain exceptions: 1) aliens admitted as refugees may receive food stamps for the first five years after admission, and aliens who have been granted asylum or have had their deportation withheld may receive food stamps for the first five years after such status has been granted, 8 U.S.C. § 1612(a)(2)(A); 2) permanent resident aliens who have worked 40 qualifying quarters of coverage as defined in the Act, 8 U.S.C. § 1612(a)(2)(B); and 3) veterans, active duty members of the Armed Forces, and their spouses and unmarried dependent children. 8 U.S.C. § 1612(a)(2)(C).

Plaintiffs assert that the new restrictions on food stamp eligibility will have a devastating impact on those permanent lawful residents affected by depriving them of the minimal benefits needed to meet their basic, nutritional needs. Plaintiffs assert that many food stamp recipients are children, the elderly and disabled—those who are unable to work to become self-sufficient. The Act also affects those who are currently working, but still earn less than the federal poverty guidelines. Without the benefits of the food stamp program, those permanent lawful residents unable to reach the level of self-sufficiency pursued by Congress will face severe hardship and malnutrition, resulting in devastating and irreversible health and learning impacts.

Plaintiffs assert that Section 402 of the Welfare Reform Act denies Plaintiffs and all those similarly situated, the equal protection of the laws guaranteed them by the Due Process Clause of the Fifth Amendment to the United States Constitution. In their Complaint, Plaintiffs seek a declaration that Section 402 "is unconstitutional and illegal as applied to lawful permanent residents of the United States who were lawfully present in the United States on or before August 22, 1996." Third Amended Complaint ¶ 84. Plaintiffs also seek injunctive relief, enjoining

the Defendant from enforcing Section 402 of the Welfare Reform Act prospectively and retroactively.

Before the Court is Plaintiffs' motion for a preliminary injunction. However, as argued by the Defendant, this case presents clear issues of law that are ripe for adjudication thus rendering preliminary relief inappropriate.

*Equal Protection Challenge*

1. Level of Review

■■■ The Fifth Amendment to the United States Constitution provides that "[n]o person shall be ... deprived of life, liberty, or property without due process of law." Although the Fifth Amendment does not contain the words "equal protection" the "concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment." *Hampton v. Mow Sun Wong,* 426 U.S. 88, 100, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976). It is settled law, and not disputed by the parties, that aliens, as lawful residents of the United States, are persons entitled to protection under both the Fifth and Fourteenth Amendments. *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (Fifth Amendment); *Graham v. Richardson,* 403 U.S. 365, 371, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (Fourteenth Amendment)). While similar analyses are utilized for equal protection challenges under the Fifth and Fourteenth Amendments, the two protections are not always coextensive. *Hampton,* 426 U.S. at 100. "Not only does the language of the two Amendments differ, but more importantly, there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State." *Id.*

It is the position of the Defendant that an overriding national interest is at stake in this case given Congress' plenary authority over matters of immigration and naturalization. In exercising this authority, Congress has the power to treat aliens differently from citizens. Because of this broad authority to regulate alien entry to, and the terms under which they may remain in this country, the role of the Judiciary in reviewing Congressional action is very limited. *See, Fiallo v. Bell,* 430 U.S. 787, 796, 799, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 768–70, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). The Defendant thus argues that the Court need only apply the rational basis test to determine the constitutionality of the Welfare Reform Act, relying primarily on *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). Under this standard of review, if there is any reasonably conceivable state of facts that could provide a rational basis for the classification, the statute must be upheld. *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

Plaintiffs argue that the alienage classification at issue in this case should be subject to the strict scrutiny test as aliens are a suspect class and are "a prime example of a discrete and insular minority for whom such heightened judicial solicitude is appropriate." *Graham,* 403 U.S. at 371–72 (citation omitted.) Under this standard, the statute cannot survive a constitutional challenge unless the Court finds such statute is necessary to achieve a compelling governmental interest. *Id.* Even if the Court should find that strict scrutiny does not apply, Plaintiffs ask that the Court apply some degree of heightened review given the extreme deprivation at issue. *Plyler v. Doe,* 457 U.S. 202, 223–224, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (state statute denying public education to the children of undocumented aliens must be rationally related to a substantial governmental interest).

A. Plenary Immigration Power

■■ The Court has long recognized Congress' broad authority in the areas of immigration and naturalization.

Federal authority to regulate the status of aliens derives from various sources, including the Federal Government's power to "[t]o establish [a] uniform Rule of Naturalization," United States Constitution, Art. I, § 8, cl. 4, its power "[t]o regulate Commerce with foreign Nations," *id.,* cl. 3, and

its broad authority over foreign affairs, *see, United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *Mathews v. Diaz, supra,* 426 U.S. at 84, n. 17; *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–589, 72 S.Ct. 512, 96 L.Ed. 586 (1952).

*Toll v. Moreno,* 458 U.S. 1, 10, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982). Because the authority over aliens is of a political character, the exercise of such authority is subject to narrow judicial review:

> [I]t is important to underscore the limited scope of judicial inquiry into immigration legislation. This Court has repeatedly emphasized that "over no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens ... Our cases "have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." ... Our recent decisions have not departed from this long established rule. Just last Term, for example, the Court had occasion to note that "the power over aliens is of a political character and therefore subject only to narrow judicial review." ... And we observed recently that in the exercise of its broad power over immigration and naturalization, "Congress regularly makes rules that would be unacceptable if applied to citizens."

*Fiallo,* 430 U.S. at 792 (citations omitted).

Recent cases addressing equal protection challenges to federal alienage classifications establish that the courts uniformly apply the rational basis standard of review. *See e.g., Moving Phones Partnership L.P. v. Federal Communications Comm.,* 998 F.2d 1051, 1056 (D.C.Cir.1993) *cert. denied, Cellswitch v. F.C.C.,* 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994); *United States v. Duggan,* 743 F.2d 59, 76 (2nd Cir.1984); *Jean v. Nelson,* 727 F.2d 957, 976 (11th Cir.1984) *aff'd,*

472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); *Campos v. FCC,* 650 F.2d 890, 894 (7th Cir.1981); *Abreu v. Callahan,* 971 F.Supp. 799, 815 (S.D.N.Y.1997); *Rodriguez v. United States et al.,* 983 F.Supp. 1445 (S.D.Fla.1997).

State alienage classifications, on the other hand, are generally subject to strict scrutiny. *See e.g., Graham,* 403 U.S. at 371–372; *Nyquist v. Mauclet,* 432 U.S. 1, 6, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977). The distinguishing aspect in the treatment of state versus federal alienage classifications is the fact that the federal government has the authority to regulate the conditions of entry and residence of aliens. *Mathews,* 426 U.S. at 84. "The equal protection analysis also involves significantly different considerations because it concerns the relationship between aliens and the States rather than between aliens and the Federal Government." *Id.,* at 84–85.

In *Mathews,* a unanimous United States Supreme Court upheld a federal statute that granted eligibility for Medicare benefits to resident citizens who are 65 or older, but which denied eligibility to comparable aliens unless they had been admitted for permanent residence, and have resided in the United States for at least five years. 426 U.S. at 70.[2] The precise questions addressed by the Court on appeal were "whether Congress may discriminate in favor of citizens and against aliens in providing welfare benefits; and ... if so, whether the specific discriminatory provisions in [the statute] are constitutional." *Id.* at 74.

The Court began its analyses by recognizing that aliens are entitled to the protections of the Fifth Amendment. It then went on to state:

> The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or,

**2.** The plaintiffs in *Mathews,* like the Plaintiffs herein, had argued before the district court that because the federal statute discriminated against aliens, the district court should apply the strict scrutiny test to determine the statute's constitutionality. *Diaz v. Weinberger,* 361 F.Supp. 1, 7 (S.D.Fla.1973). Although the district court rec-

ognized that there may be circumstances which warrant application of the strict scrutiny test to federal enactments, it did not reach the determination of whether strict scrutiny was appropriate in that case because it found the statute unconstitutional under the rational basis test. *Id.,* at 9–10.

indeed, to the conclusion that all aliens must be placed in a single homogenous legal classification. For a host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other, and the class of aliens is itself a heterogeneous multitude of persons with a wide-ranging variety of ties to this country.

*Id.,* 78–79. The Court then recognized the broad powers of Congress over immigration and naturalization, and that in the exercise of such powers, Congress has routinely made "rules that would be unacceptable if applied to citizens." *Id.,* at 80. Thus, "[t]he fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'" *Id.*

In reviewing the statute at issue, the Court noted that Congress' decision to provide welfare benefits to its citizens does not require it to provide like benefits to all aliens. *Id.* The Court recognized that aliens with no affinity to this country, such as overnight visitors or illegal entrants, have no colorable constitutional claim to welfare benefits. *Id.* The question then answered by the Court was not the broad issue of whether discrimination between citizens and aliens is permissible, but whether discrimination within the class of aliens is permissible. In deciding the appropriate standard of review, the Court held:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the judiciary.... Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

*Id.,* at 81–82.

Defendant argues that *Mathews* controls the determination of the proper standard of review in this case.[3] Plaintiffs argue that *Mathews* does not dictate application of the rational basis test in this case, for *Mathews* is distinguishable on three grounds. First, Plaintiffs assert that the Court in *Mathews* subjected the statute at issue to the rational basis test because, as was clear from the face of the statute, Congress properly took into consideration the character and duration of the aliens' residence when determining who would be eligible for Medicare benefits. Plaintiffs argue that in this case, Congress did not take into account the character and duration of an alien's residence to determine food stamp eligibility. Therefore, Plaintiffs' argue, Section 402 is not entitled to special deference.

The Court must reject this argument as Plaintiffs have mischaracterized the Welfare Reform Act. As discussed *supra,* permanent lawful aliens that are veterans, or are actively serving in the Armed Forces of the United States, as well as their spouse and dependent children, are eligible for food stamps under Section 402. 8 U.S.C. § 1612(a)(2)(C). Also, permanent lawful aliens that have worked 40 qualifying quarters under the Social Security Act have also been deemed eligible for food stamps. 8 U.S.C. § 1612(a)(2)(B)(ii). Furthermore, refugees, asylees and those whose deportation is being withheld are entitled to food stamp benefits for five years after such status was granted. 8 U.S.C. § 1612(a)(2)(A). It appears to this Court

---

**3.** In two prior district court opinions addressing essentially identical equal protection challenges to the Welfare Reform Act, the courts held *Mathews* dictated application of the rational basis test. *Abreu v. Callahan,* 971 F.Supp. 799, 815 (S.D.N.Y.1997); *Rodriguez v. United States et al.,* 1997 WL 702768 (S.D.Fla.1997).

that such requirements go directly to the character and/or duration of an alien's residence in this country. Accordingly, the Court rejects Plaintiffs' assertion that *Mathews* is distinguishable on this ground.[4]

Plaintiffs also argue that *Mathews* is not controlling in this case because the Welfare Reform Act does not fall within Congress' plenary power over matters of immigration and naturalization. Plaintiffs argue that as the distribution of welfare benefits has no relationship to Congress' ability to regulate the borders, the Welfare Reform Act should not be given special deference.[5] Were this Court addressing the issue on a "clean slate", such an argument may have merit and would dictate a different result. However, as recognized by Justice Frankfurter, the slate is not clean. *Galvan v. Press*, 347 U.S. 522, 530–531, 74 S.Ct. 737, 98 L.Ed. 911(1954).[6] The fact remains that courts have uniformly applied the rational basis test to federal alienage classifications that arguably fall outside Congress' plenary power over immigrants. *Mathews* is a prime example. Under Plaintiffs' argument, Medicare benefits have no more relationship to the regulation of our borders than do food stamps. Yet, the Court nonetheless subjected the restrictions on Medicare to the rational basis test.[7] Other courts have similarly applied a deferential standard of review to federal alienage classifications to matters that, on their face, appear to bear little relation to the regulation of our borders. In *Moving Phones, supra,* the court applied the rational basis test to a federal statute that precluded aliens from obtaining licenses to

---

4. Plaintiffs also argue that this case is distinguishable from *Mathews* as the Welfare Reform Act constitutes a prohibition on the receipt of welfare benefits as opposed to a postponement. Plaintiffs have provided no persuasive authority to support this distinction. *Stiles v. Blunt*, 912 F.2d 260 (8th Cir.1990) *cert. denied*, 499 U.S. 919, 111 S.Ct. 1307, 113 L.Ed.2d 241 (1991) involved a state statute that set minimum age requirements for public office. It did not touch upon the plenary power doctrine or alienage classifications. While the court in *Stiles* considered the fact that the statute merely postponed an individual's right to run for public office in reaching its decision to apply the rational basis test, there is nothing in the opinion to suggest that postponement vs. prohibition will dictate which level of review should be applied in an equal protection case.

5. This argument has received support from a number of scholars. *See e.g.*, Howard F. Chang, *Immigration Policy, Liberal Principles, and the Republican Traditions*, 85 GEO.L.J. 2105 (July 1997); Michael Scaperlanda, *Partial Membership: Aliens and the Constitutional Community*, 81 IOWA L.REV. 707 (March 1996); Linda S. Bosniak, *Membership, Equality, and the Difference that Alienage Makes*, 69 N.Y.U.L.REV. 1047 (December 1994); Gerald D. Rosberg, *The Protection of Aliens from Discriminatory Treatment by the National Government*, 1977 SUP.CT.REV. 275 (1978).

6. In response to an equal protection challenge to a federal statute that classified membership in the Communist Party a basis for deportation, Justice Frankfurter wrote:

In light of the expansion of the concept of substantive due process as a limitation upon all powers of Congress, even the war power ... much could be said for the view, were we

writing on a clean slate, that the Due Process Clause qualifies the scope of political discretion heretofore recognized as belonging to Congress in regulating the entry and deportation of aliens. And since the intrinsic consequences of deportation are so close to punishment for crime, it might fairly be said also that the ex post facto Clause, even though applicable only to punitive legislation, should be applied to deportation. But the slate is not clean. As to the extent of the power of Congress under review, there is not merely a page of history ... but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process.... But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government.... We are not prepared to deem ourselves wiser or more sensitive to human rights than our predecessors, especially those who have been most zealous in protecting civil liberties under the Constitution, and must therefore under our constitutional system recognize congressional power in dealing with aliens ...

*Galvan*, 347 U.S. at 530–531.

7. Although the Court did not expressly state that the federal statute at issue fell within Congress' plenary authority over aliens, given the Court's discussion of the plenary power doctrine in its opinion "the doctrine was extended *sub silentio* to apply to congressional actions affecting the conditions in which aliens lawfully reside in this country." *Abreu*, 971 F.Supp. at 809, n. 51.

construct and operate cellular telephones. 998 F.2d at 1056 (relying on *Mathews* ). *See also, Campos v. Federal Communications Commission,* 650 F.2d at 894 (federal statute prohibiting aliens from obtaining commercial radio operator license subject to rational basis); *Lopez v. Bergland,* 448 F.Supp. 1279, 1283 (N.D.Cal.1978) (federal statute limiting eligibility to federal farm operating loans subject to rational basis). These holdings are consistent with the Court's sweeping definitions of the plenary power doctrine. *See e.g., Takahashi v. Fish & Game Comm'n,* 334 U.S. 410, 419, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948) (Congress has "broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization"); *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909) (over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens).[8] Based on the above, the Court is not persuaded that *Mathews* can be distinguished on the basis that the Welfare Reform Act is not an exercise of plenary power, subject to special deference.[9]

Finally, Plaintiffs argue that the nature of the affected interest involved in this case must be considered in determining the appropriate standard of review, and that the affected interest involved in *Mathews* is distinguishable. Plaintiffs assert that the discontinuance of food stamps is central to one's ability to survive, while Medicare benefits are not essential to survival. Thus, such interest is at least as important as those affected interests addressed by the Court in *Wong Wing v. United States,* 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896), *Hampton v. Mow Sun Wong,* 426 U.S. 88, 100, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), and *Moving Phones,* 998 F.2d at 1056.

In *Wong Wing,* the Court held unconstitutional a federal statute which, in effect, held aliens to suffer punishment without a trial by jury, in addition to their exclusion or expulsion. 163 U.S. at 238. In finding such statute unconstitutional, the Court reasoned:

No limits can be put by the courts upon the power of Congress to protect, by summary methods, the country from the advent of aliens whose race or habits render them undesirable as citizens, or to expel such if they have already found their way into our land, and unlawfully remain therein. But to declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the sphere of constitutional legislation, unless provision were made that the fact of guilt should first be established by a judicial trial. It is not consistent with the theory of our government that the legislature should, after having defined an offense as an infamous crime, find the fact of guilt, and adjudge the punishment by one of its own agents.

*Id.,* at 237. Noting that the Thirteenth and Fourteenth Amendments do apply to all per-

---

**8.** One of the cases upon which Plaintiffs rely for the proposition that the plenary power doctrine should be strictly limited to, essentially, regulation of the borders, defines the doctrine in broad terms as well. In *De Canas v. Bica,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), the Court upheld a state statute that regulated employment of aliens. In its brief Plaintiffs' rely on that portion of the opinion in which the Court stated that "the fact that aliens are the subject of a state statute does not render it a regulation of immigration ..." *Id.* 424 U.S. at 355. However, this same sentence goes on to state "which. is essentially a determination of who should or should not be admitted into the country, and, the conditions under which a legal entrant may remain." *Id.* It appears that rather than support

Plaintiffs' argument, the *De Canas* case supports that promoted by the Defendant in this case.

**9.** The recent opinion of the Supreme Court in *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) is also of no help to the Plaintiffs in this case. Although the Court held that federal racial classifications must be subjected to the strict scrutiny test, the Court specifically recognized prior decisions where it found special deference to the political branches of the Federal Government to be appropriate, citing *Hampton,* 426 U.S. at 101–102, n. 21, which referred to the statement that "the power over aliens is of a political character and therefore subject only to narrow judicial review." *Adarand,* 515 U.S. at 217–218.

sons within the United States, the Court extended such reasoning to the Fifth and Sixth Amendments and held "it must be concluded that all persons within the territory of the United States are entitled to protection guaranteed by those amendments, and that even aliens shall not be held to answer for a capital or other infamous crime unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty or property without due process of law." *Id.* at 238.

In *Landon,* the Court held that a permanent resident alien who briefly left the United States and was detained upon her return, was entitled to procedural due process in an exclusion hearing. 459 U.S. at 32. In so holding, the Court recognized the long line of cases which provide that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application for the power to admit or exclude aliens is a sovereign prerogative ... however, once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly." *Id.* In *Hampton,* the Court addressed the issue of whether the Civil Service Commission could adopt and enforce a regulation which prohibited aliens from federal civil service, which the Court characterized as a liberty interest. 426 U.S. at 102.[10]

The rights at issue in *Wong Wing, Landon* and *Hampton* are constitutionally protected rights. In contrast, no individual has a substantive constitutional right to welfare benefits. While the Court has previously held that "as a matter of procedural due process the interest of a welfare recipient in the continued payment of benefits is sufficiently fundamental to prohibit the termination of those benefits without a prior evidentiary

hearing .. [there is no] constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits." *Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971) (construing *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). *See also, Atkins v. Parker,* 472 U.S. 115, 128–129, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985) (food stamp benefits are a matter of statutory entitlement to those qualified to receive such benefits, and are treated as a form of property entitled to procedural due process, but the procedural component of the Due Process Clause does not "impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits.") Because neither citizens nor aliens possess substantive constitutional rights to welfare benefits, including food stamps, the holdings in *Wong Wing, Hampton* and *Landon* do not dictate departure from the standard of review applied in *Mathews.* *Cf., San Antonio Indep. School District v. Rodriguez,* 411 U.S. 1, 33, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (The Court will not create substantive constitutional rights in the name of guaranteeing equal protection of the laws. To determine whether an interest is fundamental, the Court must determine whether such interest is explicitly or implicitly guaranteed by the Constitution.)

The only case submitted by Plaintiffs which suggests that the nature of the interest should dictate the standard of review is *Moving Phones, supra.* In *Moving Phones,* the court, in dicta, determined that a strict scrutiny analysis has been applied to alienage classifications that strike at the " 'noncitizens' ability to exist in the community" by denying them essential welfare assistance. 998 F.2d at 1056. In support of this position, the court relied upon *Foley v. Connelie,* 435 U.S.

---

10. *Hampton* does not stand for the proposition that when Congress discriminates against aliens in a manner that deprives them of a liberty interest, such congressional action must be subjected to a strict scrutiny analysis. "By broadly denying this class substantial opportunities for employment, the Civil Service Commission rule deprives its members of an aspect of liberty. Since these residents were admitted as a result of decisions made by the Congress and the President, implemented by the Immigration and Naturalization Service acting under the Attorney Gen-

eral of the United States, due process requires that the decision to impose that deprivation of an important liberty interest be made either at a comparable level of government or, if it is to be permitted to be made by the Civil Service commission, that it be justified by reasons which are properly the concern of that agency," *Hampton,* 426 U.S. at 116. Thus, the issue of whether a federal statute barring federal employment would be subjected to a higher level of review was not addressed. *Id.,* at 117 (concurring opinion of Justice Brennan and Marshall).

291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978). The court recognized that *Foley* involved state regulation of aliens, but that "for purposes of this case, that fact represents a distinction without a difference." 998 F.2d at 1056, n. 3. The court determined that *Foley* stands for the proposition that any alienage classification that is inconsistent with Congress' determination to admit aliens to permanent residence must be subjected to strict scrutiny. *Id.* Since *Mathews* did not involve a welfare benefit essential to exist in the community, the court stated that the Medicare statute at issue in *Mathews* would have withstood the test set forth in *Foley.* *Id.* This analysis, however, ignores those essential reasons that have distinguished state alienage classifications from similar federal classifications, a matter recognized by the Court in *Foley.* 435 U.S. at 295. Accordingly, *Moving Phones* is not persuasive authority.

In sum, there is no basis upon which to depart from the legion of cases that hold Congress is entitled to a deferential standard of review when enacting laws that affect the regulation of aliens.

*Rational Basis*

 In applying the rational basis test, the Court has cautioned the judiciary that application of the test "in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller,* 509 U.S. at 319 (citation omitted). Nor does it authorize the courts to "judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Id.* Thus, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. *Id.* Where there is any reasonably conceivable state of facts that could provide a rational basis for a classification, such classification must be upheld. *Id.* at 320. Plaintiffs have the burden of negating every conceivable basis which might support the classifications contained in the Welfare Reform Act. *Id.*

Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality' ... The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.

*Id.* 509 U.S. at 321.

The Defendant asserts that Congress' rationale for the Welfare Reform Act are 1) the highest priority for limited welfare funds should be to provide for citizens; 2) noncitizens should be encouraged to become self-sufficient or rely on families, sponsors or private organizations; 3) welfare benefits should not be an attraction to immigration, both legal and illegal; and 4) the burden of providing subsistence payments should fall on an individual's own country, or on state or private sources. The Defendant further argues that Congress intended the Welfare Reform Act to promote non-citizen legal aliens to become naturalized.

Plaintiffs argue that the Welfare Reform Act does not promote self sufficiency, when certain of the Plaintiffs are disabled, or already work but do not earn sufficient pay. The Defendant notes that some legal aliens will not become self-sufficient. In such situations, however, the responsibility for those class of Plaintiffs should go to families, sponsors and private organizations. An argument similar to that of Plaintiffs' was addressed by the Court in *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). When addressing an equal protection challenge to a state statute that limited AFDC benefits to families, the Court noted that the employment incentive would not apply to all affected. "But the Equal Protection Clause does not require that a State must choose between attacking every aspect of the problem or not attacking the problem at all ... It is enough that the State's action be rationally based and free from invidious

discrimination" *Id.*, 397 U.S. at 486–487 (citation omitted) (Finding statute met the rational basis test).

Plaintiffs also argue the stated purpose of deterring immigration has no rational basis to legal aliens already residing in this country. For this same reason, Plaintiffs argue the stated goal of making sponsors more accountable is not served by those legal aliens already in this country on the date of the Welfare Reform Act's enactment. If such class of legal aliens had sponsors, their legal duties have long since passed. Assuming Plaintiffs' argument is correct, the Welfare Reform Act would nonetheless meet the rational basis test if any of the other goals or rationales for the classification are rationally related to the class of affected aliens that reside in the country. The Court finds that the stated goals of promoting naturalization and placing the highest priority for limited welfare funds to provide for citizens are rationally related to aliens residing in the country.

■ Plaintiffs argue that the stated goal of promoting naturalization is not included in the Welfare Reform Act, nor does it appear in the legislative history. There is no such requirement, however. *Heller*, 509 U.S. at 320. The test is whether there is any conceivable state of facts that support the classification. As noted by the court in *Abreu v. Callahan*, the promotion of naturalization is a legitimate goal. 971 F.Supp. at 816 (listing cases). Plaintiffs similarly challenge the stated goal of preserving welfare benefits to citizens. This rationale was specifically accepted by the Court in *Mathews*. 426 U.S. at 83.

As noted above, Plaintiffs have the burden of negating every conceivable basis that may support the Welfare Reform Act. Plaintiffs have failed to meet this burden. Accordingly, the Court finds that the Welfare Reform Act does not violate the Equal Protection Clause of the Fifth Amendment, as it is rationally related to legitimate governmental interests.

*Retroactive Application*

■ In their Third Claim for Relief, Plaintiffs assert that as the Welfare Reform Act did not direct the Defendant "to apply Section 402 retroactively to deny food stamps to applicants who filed prior to the enactment of the Act and who were eligible under prior law for a time period prior to the enactment of the Act, nor did it otherwise express any intention that Section 402 should apply retroactively." Third Amended Complaint ¶ 87. Thus, the Defendant's retroactive application of the Welfare Reform is contrary to law, arbitrary and capricious, an abuse of discretion and a violation of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. It appears from the Complaint, however, that none of the named Plaintiffs have been affected by a retroactive application of the Welfare Reform Act. All Plaintiffs were receiving food stamp benefits when the Act took effect. Thus, none of the named Plaintiffs have standing to assert this claim. Accordingly, it must be dismissed without prejudice.

### ORDER

IT IS HEREBY ORDERED that Plaintiffs' Motion for a Preliminary Injunction is DENIED. The Defendant's Motion to Dismiss is GRANTED. Plaintiffs' Third Amended Complaint is DISMISSED. Counts One and Two are DISMISSED WITH PREJUDICE. Count Three is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.